UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JOY R. HENSLEY, | ) |
|     Plaintiff, | ) |
| v. | ) Case No.: 2:09-cv-0101 |
| | ) SENIOR JUDGE NIXON |
| | ) MAGISTRATE JUDGE BROWN |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
|     Defendant. | ) |

To:    The Honorable John T. Nixon, Senior Judge

**REPORT AND RECOMMENDATION**

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff's claim for disability insurance benefits (DIB) and supplemental security income (SSI), as provided under Title II and Title XVI of the Social Security Act ("Act"). 42 U.S.C. §§ 401–433, 1381–1383. The case is currently pending on plaintiff's motion for judgment on the administrative record. (Docket Entry No. 18). The Magistrate Judge has reviewed the administrative record. (Hard copy of Administrative Record noted on Docket as received on February 12, 2010) (hereinafter "Tr."). For the reasons stated below, the Magistrate Judge recommends that the Plaintiff's motion for judgment be **DENIED**, and that the decision of the Commissioner be **AFFIRMED**.

**I. INTRODUCTION**

Plaintiff protectively filed her application for DIB and SSI on January 24, 2007, with an alleged onset of disability of January 10, 2007. (Tr. 96). Plaintiff's claim was denied first on March 19, 2007, and again after reconsideration on May 18, 2007. (Tr. 74, 76). Plaintiff's

1

request for a hearing before an administrative law judge ("ALJ") was granted and took place on March 11, 2009. (Tr. 22–39). The Plaintiff, represented by counsel Donna Simpson, and a vocational expert ("VE") testified at the hearing. *Id.* The ALJ's written decision, dated April 22, 2009, denied Plaintiff's claim. (Tr. 9–19). The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2. The claimant has not engaged in substantial gainful activity since January 10, 2007, the alleged onset date (20 CFR 416.971 *et seq.*).

3. The claimant has the following severe impairments: personality disorder, not otherwise specified; anxiety disorder; depression; and panic disorder ( 20 C.F.R. 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5. The claimant's mental impairment does not meet or medically equal the criteria of listings 12.04, 12.06, and 12.08. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.[1]

6. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: Due to mental difficulties, the claimant is not limited in the ability to understand and remember. The claimant will have some difficulty in persistence, pace, and completing tasks but she still can do. She is limited in

---

[1] The "findings of fact" portion of the ALJ's decision omits the number "5." Here, the numbering is listed as it would be had no number been inadvertently skipped.

the ability to interact with coworkers and supervisors but is able to function in work-like settings. She cannot deal effectively with the general public. The claimant will have some difficulty with maintenance of adaptation but can set independent goals.

7. The claimant is capable of performing past relevant work as a gluer (factory) sorter. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. 404.1565 and 416.965).

(Tr. 14–19).

Plaintiff requested review of the ALJ hearing and decision by the Appeals Council ("AC") on April 27, 2009. (Tr. 4–7). Subsequently on September 5, 2009, the AC denied the request stating they found no reason to review the ALJ's decision, rendering the ALJ's decision as the final decision of the Commissioner of Social Security in this case. (Tr. 1). The Plaintiff timely filed this civil action, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

The Plaintiff was a forty-year-old woman at the time of the ALJ's decision with an alleged onset date of January 10, 2007. (Tr. 96). She earned her high school diploma through adult education classes in 2000 after having dropped out of school in the eleventh grade. (Tr. 23). Her past relevant work history includes restaurant cook, factory sorter, and school bus driver. (Tr. 140).

A. Testimonial Evidence

The Plaintiff has lived with her mother for her entire life except a 4-month period when she lived with her husband. (Tr. 29). She is now divorced and does not have many social relationships with people outside her family. (Tr. 34). The plaintiff admits that she has a temper

3

and has trouble getting along with others including close family members. *Id.* In testimony before the ALJ, the plaintiff claimed that she was unable to work due unpredictable panic attacks, depression, schizophrenia, and "bipolar." (Tr. 23–24). She asserts that, after she lost her job as a school bus driver, which she attributes to her inability to get along with the school bus monitor who accompanied her on the bus route, she began to have panic attacks.[2] (Tr. 28). They cause her to jerk and shake her arms and legs and produce pain in her inner ear. *Id.* After a panic attack, she alleges that she has to lay down and rest for four to five hours. (Tr. 30). The plaintiff further testified that she sleeps quite a bit but is able to dress, bathe, and prepare light meals for herself. (Tr. 26). When asked if she was able to follow a story of a TV show, she replied that she can do so intermittently because paranoid thoughts cause her to periodically look out the window to ensure no one is "watching" her. *Id.* The plaintiff further stated that she experiences visual hallucinations that scare her and make her very anxious. (Tr. 33–34).

Much of the above was reported when the Plaintiff completed her "function report" on February 10, 2007. In addition to her claims of anxiety, panic attacks, and anger management issues, the plaintiff wrote on her function report that she suffered from the following conditions: "PTSD, OCD, manic depression, mania depression, depression, panic disorder, anxiety, vertigo, stress, nervousness, and dysthymia." (Tr. 136). She reported that she goes shopping sometimes and is able to drive, but she has to return home if she starts to feel like people are going to grab her. (Tr. 129). She wrote that she has difficulty with memory, completing tasks, concentration,

---

[2] During questioning about the onset of her panic attacks, the plaintiff recalled that she had been seeing Dr. Durvasula Since January of 2008 and was further able to recount without hesitation that she had seen Dr. Remsing at Life Care from February 13, 2007 through December 26, 2007.

4

understanding, following instructions, and getting along with others. (Tr. 134). She noted that sometimes she needs to be reminded to take her medication; however, she writes things down to remember changes in her regular routine and keeps receipts to manage her money. (Tr. 131, 133, 135).

## B. Medical Evidence

The administrative record includes voluminous information regarding the plaintiff's medical history from 2004 to 2009. In 2004, the plaintiff was seen at LifeCare Family Services ("LifeCare") after having been referred there by her primary care doctor for psychological therapy and medication management. (Tr. 212). Through 2005 and 2006, the plaintiff established Dr. J. Lee Copeland ("Copeland") and his nurse practitioner Cheryl Focer ("Focer") as her primary care providers and was seen in their office approximately twenty times for various health issues. (Tr. 245–267). After the plaintiff was terminated from her position as a school bus driver on January 10, 2007, she filed the application at issue here for disability benefits. (Tr. 31, 96). Subsequently, she was evaluated by various mental health professionals including those designated by the State for disability determination. The plaintiff's mental status was examined by the following providers: Nile Remsing ("Remsing"), mental health nurse practitioner (Tr. 430) (see credentials listed with Remsing's E-signature); Dr. Lawrence Edwards ("Edwards"), examiner with the Tennessee Disability Determination Services (Tr. 311); Mr. Jerrel Killian, psychologist (Tr. 478); Dr. Heather Adkins, neurologist (Tr. 473); and Dr. Viswa Durvasula ("Durvasula"), psychiatrist (Tr. 497). The findings of each provided are presented here in chronological order.

The plaintiff visited LifeCare in 2004 after her primary care doctor advised her to stop

5

driving the school bus due to the fact that she was having problems with dizziness. (Tr. 213). She presented to LifeCare with complaints of depression, anxiety, paranoia, pervading thoughts, and compulsive actions. (Tr. 212). On September 17, 2004, the provider for the plaintiff's initial visit to LifeCare noted that the plaintiff crossed acceptable social boundaries when she hugged a therapist who left the room and "repeatedly asked the diagnostician to be her therapist and allow her to call him." *Id.* He diagnosed the plaintiff with schizoaffective disorder, panic disorder without agoraphobia, anxiety disorder, obsessive-compulsive disorder, and borderline intellectual functioning. *Id.* At the following visit on September 30, 2004, notes indicate that the plaintiff was unable to focus and repeatedly asked for a note that would allow her to return to her job as a school bus driver. (Tr. 214). The provider noted that the plaintiff complained of paranoia, hallucinations, and anxiety. *Id.* She was easily distractable, had a bright, inappropriate affect, and acted younger than her stated age. *Id.* After the provider informed her that only her primary care doctor could provide clearance to return to work, the plaintiff ended the visit. *Id.* Finally, the plaintiff cancelled an appointment at LifeCare scheduled for October 26, 2004 and advised that she no longer wanted their services. (Tr. 330). The record yields no information about how or when the plaintiff was released to work after this apparent leave of absence in 2004.

In February of 2005, the plaintiff established Dr. Copeland and Ms. Focer as her primary care providers. (Tr. 291). Her medications were listed as Lexapro, meclizine for dizziness, Valium as needed for vertigo, and birth control pills. *Id.* Copeland assessed that the plaintiff

6

suffered from Meniere's disease[3] and generalized anxiety disorder/depression. Through the remainder of 2005 and 2006, records from Dr. Copeland's office do not indicate any change in the aforementioned conditions or medications.[4] In addition, Copeland's office provided physical exams for the plaintiff's commercial driver's licence on July 6, 2005 and July 5, 2006 certifying that she was capable of such work on both occasions. (Tr. 256–58, 274–77).

After being terminated from her position as a bus driver, the plaintiff visited Dr. Copeland's office on January 22, 2007. (Tr. 241). The provider noted that she was having difficulty coping with the loss of her job and set an appointment of January 24th for the plaintiff to meet with psychiatrist, Dr. Edwards. (Tr. 241–42). Dr. Edwards evaluated the plaintiff as scheduled and observed that she had an unusual presentation and sometimes seemed to be mentally retarded. (Tr. 232). He also recorded that the plaintiff's social skills were inappropriate and that she did not keep up with conversations well. *Id.* Dr. Edwards opined that LifeCare could most appropriately serve the plaintiff's needs and advised Copeland's office of the same. (Tr. 234).

Upon intake at LifeCare, the plantiff complained of vertigo, anxiety, depression, and paranoia. (Tr. 307). The provider opined that the plaintiff was mentally disabled in such a way that she should not be driving a "busload of children." *Id.* The plaintiff continued to be treated at LifeCare and Volunteer Behavioral Health Care System through the end of 2007. At the same

---

[3] Meniere's disease is an inner ear disorder that causes spontaneous episodes of vertigo along with potential hearing loss and/or ringing in the ears. www.mayoclinic.com/health/menieres-disease/DS00535 **(last visited July 28, 2010).**

[4] The plaintiff was seen in Dr. Copeland's office approximately twenty times between 2005 and 2006. The visits were primarily for various medical problems and sickness such as fatigue, pink eye, bronchitis, and back pain. (Tr. 245–91).

7

time, she returned to Dr. Edwards on March 6, 2007 after the Social Security Examiner ordered the plaintiff to submit to a disability determination evaluation. (Tr. 311).

In his role as a mental health professional for the purpose of evaluating mental health of disability applicants, Dr. Edwards performed a clinical interview, mental status exam, and the "Rey 15-item test for Malingering." *Id.* Edwards opined that the plaintiff appeared to be reporting symptoms that were inconsistent with reality in an attempt to make her condition seem worse than it was. (Tr. 318). He based this assertion on the following observations from his interview: (1) her ability to maintain her job as a bus driver for seven years; (2) her ability to earn a high school diploma; (3) the statement that her mother takes care of her meals followed by a contradictory statement that she drives herself to Dairy Queen most days for lunch; (4) abnormalities in a simple word recall test during which the plaintiff claimed not to remember words, but later actually did recall the words; and (5) her ability to recite her social security number forwards and backwards from memory. (Tr. 315–17). Dr. Edwards, having considered his interactions with the plaintiff and all of the medical records provided by the Social Security office, concluded that she was moderately limited in her ability to interact with others, but had no limitations with understanding or remembering, sustaining concentration and persistence, or adapting to change and requirements. (Tr. 319).

Returning to her treatment at LifeCare in early 2007, providers noted that the plaintiff was needy, paranoid, and had poor insight and judgment, but that she had normal thought content and form. (Tr. 363). Records in May 2007 state that the plaintiff was still suffering from hallucinations and panic attacks, but that she was not taking her Xanax as prescribed. (Tr. 387). In July 2007, the plaintiff transferred to Volunteer Behavioral Heath Care System ("VBHCS")

8

for further therapy and medication management. (Tr. 393, 471). At each of the four visits during August 2007, the provider opined that the patient's reliability and compliance were questionable due to her admission that she was not taking her medication at the prescribed dose. (Tr. 429–45). Also, the plaintiff began alleging symptoms of jerking and shaking which the provider did not attribute to her medication mismanagement. (Tr. 431). The plaintiff made weekly therapy visits to VBHCS with the provider's long term goal being relief of the plaintiff's symptoms. *Id.* At no point did providers from VBHCS evaluate the plaintiff's ability to work. After months of weekly therapy, the plaintiff cancelled an appointment scheduled for January 3, 2008 and advised that she no longer wanted services at VBHCS. (Tr. 458).

Due to complaints of jerking and shaking reported to Dr. Copeland's office, the plaintiff was referred to neurologist, Dr. Adkins on December 14, 2007. The neurologist opined that the plaintiff's episodes did not seem to be caused by underlying neurological disease and prescribed Neurontin for treatment of headaches and anxiety. (Tr. 474, 482). Dr. Adkins suggested that the plaintiff's complaints of anxiety, panic, and hallucinations should be closely followed by a psychiatrist. *Id.* Following this visit, the plaintiff was referred to psychologist, Jerell Killian by attorney Donna Simpson, the lawyer representing her in this action.

Mr. Killian performed a psychological examination on the plaintiff on December 18, 2007. (Tr. 478). He noted that the reason for referral was that the plaintiff was seeking to qualify for disability. *Id.* He observed that she was able to provide general personal history including information regarding her schooling and employment history but was limited on her ability to recall specific dates and other details. *Id.* Mr. Killian tested the plaintiff's IQ and reported that she scored 65 for verbal, 61 for Performance, and 51 for Full Scale. (Tr. 479). He

9

noted that her reading was in the borderline range but that other scores were in the mild mental retardation range. *Id.* He diagnosed her with mild mental retardation and noted that she seemed to make an honest effort during the testing. (Tr. 480). Mr. Killian observed that the plaintiff had been able to maintain past employment and that conflicts with supervisors and co-workers along with inability to maintain production standards seemed to have been the source of problems with past positions. *Id.* He opined that she may have a lower level of functioning than in the past and that difficulties with memory and reasoning were "major obstacles for employment." *Id.*

Following the December 2007 visits with the neurologist and psychologist, it appears that the plaintiff sought psychiatric treatment beginning February 14, 2008 with Middle Tennessee Psychiatry Group under the care of Dr. Durvasula. (Tr. 505). Through several months of treatment, the plaintiff alleged similar problems to Dr. Durvasula that she had reported to prior clinicians such as depression, anxiety, panic attacks, hallucinations, and paranoia. (Tr. 506). Dr. Durvasula opined that the plaintiff's memory was intact, her thoughts were organized, and that her insight and judgment were present. (Tr. 506). The plaintiff reported at her March 2008 visit that she was no longer hearing voices or having hallucinations. (Tr. 504). Dr. Durvasula noted again that the plaintiff's thinking was organized and memory was intact. *Id.* He also noted that her insight and judgment were present but limited and suggested supportive therapy and relaxation techniques. *Id.* Dr. Durvasula saw the plaintiff twice in April 2008 and completed a medical assessment form related to the plaintiff's mental ability to do work-related activity on May 7, 2008. (Tr. 498). He marked that she had poor ability to do the following: deal with the public; deal with work stresses; function independently; and maintain attention. *Id.* He evaluated that she had a fair ability to understand, remember, and carry out simple job

10

instructions but nothing more complex. (Tr. 499). Dr. Durvasula further noted that the plaintiff was emotionally unstable and unpredictable in social situations but fairly reliable. *Id.*

In June 2008, the plaintiff visited her primary care provider at Dr. Copeland's office requesting a commercial driver's physical exam. (Tr. 489). Ms. Focer explained to the plaintiff that she would not be able to provide this service because she did not feel the plaintiff was mentally or physically capable of driving a school bus. *Id.* Upon receiving this information, the plaintiff demanded her medical records, became irate, and physically assaulted two nurses. *Id.* When the plaintiff reported this incident to Dr. Durvasula two days later, she asked him to write a letter stating that she suffered from schizophrenia. (Tr. 501). He refused to do so based on his evaluation that she had not reported hallucinations in several months and was on no medication for hallucinations or any kind of psychosis. *Id.* She became angry at his refusal to cooperate, but calmed down after he advised she would need to start treatment with another physician. *Id.* Dr. Durvasula's reports continue to consistently note that the plaintiff was anxious and heard voices occasionally, but that her memory was intact, thinking was organized, and judgment and insight were limited through January 23, 2009.

### III. CONCLUSIONS OF LAW

#### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

11

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

### B. Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

(1) If the claimant is working and the work constitutes substantial gain activity, benefits are automatically denied.

(2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[5]

---

[5] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

> or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.
>
> (4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.
>
> (5) Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the valuation process can be carried by relying on the medical vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe.

13

*See* 42 U.S.C. § 423 (d)(2)(B).

### C. Plaintiff's Statement of Errors

Plaintiff alleges three errors in the ALJ's decision: (1) the ALJ erred in his failure to find Plaintiff disabled pursuant to 12.05(C); (2) the ALJ did not properly consider the opinion of Dr. Viswa Durvasula; and (3) the ALJ did not properly consider Plaintiff's subjective reports of her impairments.

### I. The ALJ's evaluation of Plaintiff meeting or equaling a listed impairment

The ALJ's determination that the Plaintiff did not meet or medically equal the criteria for the listed impairment of "mental retardation" is supported by substantial evidence. The listed impairment for mental retardation requires that the claimant meet the diagnostic description of the initial paragraph *and* the requirements of one of four sets of criteria listed below the initial paragraph. 20 C.F.R. 404, subpart P, Appendix 1, § 12.00(A). The introductory paragraph defining mental retardation for the purposes of listing 12.05 requires that a claimant demonstrate "significantly subaverage general intellectual functioning with deficits in adaptive functioning[6] initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. 404, subpart P, Appendix 1, § 12.05. Section "C" below the introductory paragraph requires that a claimant have a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. 404, subpart P,

---

[6] Adaptive functioning refers to the skills a person uses in daily living such as the following: communication; home-living skills; use of community resources; health, safety, leisure, self-care, and social skills; self-direction; functional academic skills; and job-related skills. http://www.minddisorders.com/Kau-Nu/Mental-retardation.html. **(last visited July 29, 2010).**

14

Appendix 1, § 12.05(C).

The plaintiff argues that records showing that the plaintiff repeated the first grade and later scored 76 on a full scale IQ assessment at age 14 are sufficient evidence to show that she "had difficulty before age eighteen (18)." The Magistrate Judge does not believe that evidence of academic difficulty and an IQ result that does not fall in the mentally retarded range is enough to show onset of mental retardation prior to age twenty-two (22). The record shows that the plaintiff was referred for psychological testing because she had a failing grade in eighth-grade English. (Tr. 207). She was fourteen (14) years old at the time and scored 78 on verbal, 78 on performance and 76 on the full scale IQ test. (Tr. 205). The record indicates that IQ scores between 70 and 79 reflect "borderline" intelligence and scores between 80 and 89 reflect "low average" intelligence. *Id.* Regarding the plaintiff's adaptive functioning, the plaintiff's eighth grade English teacher marked that she had average responsibility for her age, average ability to complete assignments, and that her social behavior was always appropriate. (Tr. 209). Additionally, a personality profile report card for grades Kindergarten through seventh grade reflects outstanding and average performance with respect to attitude, courtesy, cooperation, devotion to ideals, industry, reliability, acceptance by group, thrift, and appearance. She received some "average" and "below average" marks for emotional stability. The facts that the plaintiff's IQ score was above 70 at age fourteen and that teachers generally reported that she demonstrated average adaptive functioning skills are substantial evidence that she should not be considered mentally retarded as defined in the initial paragraph of section 12.05.

Aside from the initial paragraph of section 12.05, the claimant must meet one of four criteria listed thereunder. 20 C.F.R. 404, subpart P, Appendix 1, § 12.05. The plaintiff asserts

that she meets the criteria listed at C which requires that a claimant have a valid IQ of 60–70 and another mental or physical condition that significantly limits the claimant's ability to work. *Id.* The plaintiff uses IQ scores obtained by Mr. Killian in December 2007 (verbal IQ of 65, performance IQ of 61, and full scale IQ of 51) coupled with the ALJ's finding of other severe impairments at Step Two of the evaluation process to support her claim that she meets the requirements of subsection C. However, case law support's the defendant's notion that IQ scores are not always reliable. In *Bilka v. Commissioner*, 252 F.Supp.2d 472, 476, the court noted that IQ testing prior to age 22 is determinative for the purposes of 12.05(C) and that lower scores after age 22 absent some type of brain injury need not be accepted in light of an applicant's past ability to work. *Bilka v. Commissioner*, 252 F.Supp.2d 472, 476 (N.D. Ohio 2002). Here, the plaintiff's questionable credibility and past ability to maintain a job as a school bus driver for seven years are enough to question the validity of the disparate IQ results obtained by Mr. Killian. In sum, the undersigned opines that the record contains substantial evidence to support the conclusion that the plaintiff was not mentally retarded as defined in the introductory paragraph of 12.05 or in subsection C.

### II. The ALJ's consideration of the opinion of treating physicians

Plaintiff argues that Dr. Durvasula's assessment is consistent with the medical record and should have been given more weight than the opinion of Dr. Edwards. It is well-established that opinions of treating physicians are entitled to more weight than a contrary opinion of a consultative examiner who has evaluated the claimant only one time. *Rogers v. Commissioner*, 486 F.3d 234, 242 (6th Cir. 2007); *Farris v. Secretary of H.H.S.*, 773 F.2d 53, 55 (6th Cir. 1985). However, the ultimate decision of a claimant's disability rests with the ALJ. *Walker v. Secretary*

16

*of H.H.S.*, 980 F.2d 1066, 1070 (6th Cir. 1992). Dr. Edwards acted as both a treating physician and a consultative examiner for the plaintiff in this case. He first saw the patient on January 24, 2007 after she was referred to his office by her primary care physician. (Tr. 241–42). Her second visit to Dr. Edwards was initiated by the Social Security Examiner for the purpose of disability determination. (Tr. 311). On the other hand, Dr. Durvasula saw the plaintiff as a treating physician on numerous occasions from February 2008 until the end of the available record. (Tr. 497–544). It appears to the Magistrate Judge that the ALJ in the present case took the opinions of *both* Dr. Durvasula and Dr. Edwards into consideration when assessing the plaintiff's residual functional capacity (RFC).[7]

The ALJ determined that the plaintiff was not limited in her ability to understand and remember. (Tr. 15). This is supported throughout Dr. Durvasula's records as he consistently noted that the plaintiff's thinking was organized and that her memory was intact. (Tr. 501–06, 539–45). Next, the ALJ opined that the plaintiff would have difficulty with persistence, pace, and completing tasks. (Tr. 15). This is consistent with Dr. Durvasula's assessment that the plaintiff was fairly reliable and capable of carrying out simple job instructions. (Tr. 499). In contrast, Dr. Edwards opined that the plaintiff had *no* limitations with sustaining concentration and persistence. (Tr. 319). Further assessing the plaintiff's RFC, the ALJ wrote that the plaintiff was limited in her ability to interact with coworkers and supervisors and could not deal with the general public. (Tr. 15). This too incorporates Dr. Durvasula's opinion that the plaintiff's

---

[7] The Magistrate Judge believes that the ALJ may have overstated the weight given to the opinion of Dr. Edwards, and furthermore may have neglected to discuss many details about the opinions of Dr. Durvasula. However, the ALJ does not expressly reject Dr. Durvasula's findings and seems to have incorporated both opinions when formulating the plaintiff's RFC.

17

ability to relate to coworkers and supervisors was fair and that she had poor or no ability to deal with the public. (Tr. 498). In conclusion, there is substantial evidence to support the ALJ's RFC determination, which clearly reflects Dr. Edwards and Dr. Durvasula's opinions.

### IV. The ALJ's consideration of Plaintiff's subjective claims of impairment

The plaintiff argues that her subjective claims of disabling anxiety, panic attacks, and paranoia were verified by reports from her aunt and mother and, therefore, were credible. Here, the ALJ's decision cites specific evidence from the case record to support his credibility determination regarding the plaintiff's subjective complaints. S.S.R. 96-7p. An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997) (citing 42 U.S.C. § 423 and 20 C.F.R. 404.1529(a)). Discounting the credibility of a claimant is appropriate where the ALJ finds contradictions from medical reports, claimant's other testimony, and other evidence. *Id*. Also, an ALJ's adverse credibility finding may be supported by the claimants' failure to seek significant medical treatment. *Blacha v. Secretary of H.H.S.*, 927 F.2d 228, 231 (6th Cir. 1990).

The ALJ first notes reason to doubt the plaintiff's credibility regarding her mental health due to a lack of formal mental health treatment prior to her disability application. (Tr. 17). The record reflects that prior to January 2007, the plaintiff only sought mental health treatment three times at LifeCare in 2004. *Id.* The ALJ also relies on Dr. Edwards' opinion that the plaintiff tried to make her symptoms seem worse than they were and that the plaintiff's Rey test for malingering revealed validity issues. (Tr. 18). Specifically, Dr. Edwards reported inconsistencies such as the fact that she acted childlike at times but was adept and adamant when

18

discussing her symptoms, and that she claimed to be unable to recall three simple words, but when she was told that almost anyone could perform such a task she remembered correctly repeated two of the three words and repeated them again after a five-minute delay.[8]  Finally, the ALJ concludes that plaintiff's ability to perform daily tasks negates the credibility of her complaints.  (Tr. 19).  He notes that she is able to prepare simple meals, perform household chores, drive and ride in cars, and shop.  *Id.*  The Magistrate Judge believes that, despite the contrary claims of the plaintiff's mother and aunt, there is sufficient objective evidence in the record to support the ALJ's determination that the plaintiff's complaints were not fully credible.

## IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that Plaintiff's Motion for Judgment on the Administrative Record be **DENIED**, and that the decision of the Commissioner be **AFFIRMED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court.  Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004 (en banc)).

---

[8] The Magistrate Judge notes that the plaintiff was able to recall specific dates regarding her treatment at LifeCare during the ALJ hearing.  (Tr. 31).

Entered this 2nd day of August, 2010.

/S/ Joe B. Brown
_____
JOE B. BROWN
United States Magistrate Judge